**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

KIMBERLY D. ESTEP,

     Plaintiff,

v.                                    CIVIL ACTION NO. 3:18-cv-01537

ANDREW SAUL,[1]
Commissioner of Social Security,

     Defendant.

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

Plaintiff Kimberly D. Estep ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order entered on January 4, 2016, and filed in this case on December 26, 2018, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Complaint (ECF No. 13), the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16), and Claimant's Reply to Defendant's Brief in Support of Defendant's Decision (ECF No. 17).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 48 years old at the time of her alleged disability onset date and 51 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 54, 65.)[2]  She is a high school graduate. (*Id.* at 27, 164.)  Most recently, she worked in housekeeping at a hospital, and she has also been employed as a janitor, a dietary aide in a nursing home, and a baker at a deli. (*Id.*)  Claimant alleges that she became disabled on September 21, 2014, due to discoid lupus, vision problems, depression, and panic attacks. (*Id.* at 163.)

Claimant protectively filed her application for benefits on November 26, 2014. (*Id.* at 141–48.)   Her claim was initially denied on March 6, 2015, and again upon reconsideration on October 6, 2015. (*Id.* at 77–79, 82–84.)  Thereafter, on December 11, 2015, Claimant filed a written request for hearing. (*Id.* at 85–86.)  An administrative hearing was held before an ALJ on August 10, 2017, in Charleston, West Virginia. (*Id.* at 23–52.)  On November 17, 2017, the ALJ entered an unfavorable decision. (*Id.* at 7–22.)  Claimant then sought review of the ALJ's decision by the Appeals Council on January 17, 2018. (*Id.* at 139–40.)  The Appeals Council denied Claimant's request for review on

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9.

November 1, 2018, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id.* at 1–6.)

Claimant timely brought the present action on December 26, 2018, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative proceedings (ECF No. 9).  Claimant subsequently filed her Brief in Support of Complaint.  (ECF No. 13.)  In response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 16), and Claimant then filed her Reply to Defendant's Brief in Support of Defendant's Decision (ECF No. 17).  As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. Mental Health Treatment

Dr. Mahija Kottapalli, M.D. ("Dr. Kottapalli"), a psychiatrist, treated Claimant for depression and anxiety in 2013 and 2014.  (Tr. at 318–22.)  Claimant presented to Dr. Kottapalli on October 7, 2014.  (Tr. at 322.)  She reported "no complaints" but expressed a desire to switch her medications and a fear that she could not "cut down" on her use of other medications.  (*Id.*)  Her mental status examination was normal.  (*Id.*)  Dr. Kottapalli made no changes to Claimant's medications.  (*Id.*)

On November 9, 2015, Claimant presented to her primary care provider, Lahoma Wilson, N.P. ("Ms. Wilson"), complaining of depression.  (*Id.* at 425.)  She was referred to psychologist Dr. Kathryn Cadle, Psy. D. ("Dr. Cadle").  (*Id.* at 426.)  Claimant first met

with Dr. Cadle that same day, and upon mental status examination, Dr. Cadle observed that Claimant appeared "dishevelled [sic] and underweight" and had a "sad" mood with a "sullen and constricted" affect. (*Id.* at 574.) Dr. Cadle also noted that Claimant's judgment was impaired. (*Id.*)

Claimant returned to Dr. Cadle on December 22, 2015, "for a more thorough evaluation." (*Id.* at 571.) Claimant reported "depressed moo[d], crying spells, irritability, low energy . . . less ability to focus, less interest in activities and thoughts about . . . people who have died." (*Id.*) The stressors she identified to Dr. Cadle included her unemployment, the psoriasis on her face, and family issues involving her husband and son. (*Id.*) Upon mental status examination, Dr. Cadle again observed that Claimant appeared "dishevelled [sic] and underweight." (*Id.* at 572.) She related that Claimant had an irritable mood with an angry and "expansive" affect. (*Id.*) Dr. Cadle also noted that Claimant's insight was impaired and her thought process was "tangential." (*Id.*) Claimant's mental status had not improved before her next appointment on January 7, 2016. (*Id.* at 570.) Claimant still reported issues with her husband. (*Id.*)

However, on January 21, 2016, Claimant related to Dr. Cadle that "she has been spending more time with family and friends, engaging in more pleasant activity . . . and spending more time with her husband having meals together." (*Id.* at 569.) Upon mental status examination, Dr. Cadle observed that Claimant's mood had improved, but she was still sad. (*Id.*) On February 4, 2016, Claimant reported that she was being charged with a crime, and Dr. Cadle noted that Claimant was "anxious, sad, and tearful." (*Id.* at 567.) There was little change in Claimant's mental status at her next appointment on February 18, 2016. (*Id.* at 565.)

Beginning at her appointment on March 23, 2016, though, Dr. Cadle noted consistent improvement through May 12, 2016. (*Id.* at 556–64.) On March 23, 2016, Claimant reported "feeling much better since [her] last session" and "staying very active socially and with pleasant activity." (*Id.* at 564.) Dr. Cadle observed on April 6, 2016, that Claimant's depression was "in partial remission." (*Id.* at 562.) But at her appointment with Ms. Wilson on April 13, 2016, Claimant reported increased anxiety. (*Id.* at 417.) Upon mental status examination, Ms. Wilson observed that Claimant was anxious and her affect was abnormal, but her insight, orientation, and memory were normal. (*Id.*) Claimant reported "improved mood" to Dr. Cadle on May 12, 2016. (*Id.* at 558.)

At her appointment on June 7, 2016, Dr. Cadle observed that Claimant "appeared very agitated and irritable." (*Id.* at 556.) During her appointments in June and July 2016, Claimant reported stress in her life, including the death of a neighbor and an upcoming court hearing, and Dr. Cadle observed that Claimant was agitated, irritable, angry, sad, and tearful. (*Id.* at 550–56.) Dr. Cadle still considered Claimant's depression to be "in partial remission." (*Id.*) On July 29, 2016, Dr. Cadle noted that Claimant's mood had improved. (*Id.* at 549.)

On August 19, 2016, Claimant reported to Dr. Cadle that she had "no problems with mood or anxiety." (*Id.* at 546.) However, Dr. Cadle noted that "on her assessments, [Claimant] continues to report clinically significant levels of depression and anxiety." (*Id.*) Claimant told Dr. Cadle "that she doesn't count these because she is 'used to it.'" (*Id.*) Dr. Cadle observed that Claimant's mood was sad upon mental status examination. (*Id.* at 547.) At Claimant's appointment on September 9, 2016, Dr. Cadle noted that Claimant was sad and anxious, but her mental status examination findings were

otherwise unremarkable.  (*Id.* at 545, 700.)  Dr. Cadle counseled Claimant on exposure therapy to reduce her anxiety, especially around driving.  (*Id.*)

At her next appointment with Dr. Cadle on January 27, 2017, Claimant reported "improved mood and anxiety" and told Dr. Cadle that "she has been practicing many of the skills [she and Dr. Cadle] worked on."  (*Id.* at 692.)  Dr. Cadle noted that Claimant's anxiety and depression were "in full remission" and instructed Claimant to return "only as needed."  (*Id.*)

   2.  *Consultative Mental Evaluation: Ernie Vecchio, M.A.*

Psychologist Ernie Vecchio, M.A. ("Mr. Vecchio") performed a consultative mental evaluation of Claimant on September 21, 2015.  (*Id.* at 355–61.)  Mr. Vecchio's initial impressions of Claimant "reveal[ed] a frail, meek, thin, emaciated, depressed, middle-aged Caucasion female with . . . significant facial discoloration and disfigurement."  (*Id.* at 355.)  He observed that Claimant's "overall hygiene and grooming are adequate."  (*Id.*)  Claimant reported to Mr. Vecchio that her lupus symptoms, which caused significant changes in her appearance, negatively affected her self-esteem, and that she "had mental problems from sexual abuse by [her] mother's boyfriend" during her adolescence.  (*Id.* at 356.)  Claimant stated that she felt "weak and depressed" on the day of the examination and that she "cr[ied] every single day" and refused to go out because "I can't handle people looking at me."  (*Id.*)  She reported receiving mental health treatment from Dr. Kottapalli but stated that she "never had thoughts of self-harm."  (*Id.*)

Upon mental status examination, Mr. Vecchio observed that Claimant was "depressed and frail but cooperative throughout."  (*Id.* at 357.)  He noted that she had a depressed mood and tearful affect, as well as poor insight but judgment "[w]ithin normal limits."  (*Id.* at 357–58.)  Although Claimant's immediate memory was normal, Mr.

Vecchio noted moderate deficiencies in her recent memory and mild deficiencies in her remote memory. (*Id*. at 358.) Mr. Vecchio also observed mild deficiencies in Claimant's concentration, persistence, and pace. (*Id*.) He noted mild deficiencies in Claimant's social functioning "based upon appearance, frailty, [and] possible poor control of bodily functions." (*Id*. at 359.) And he observed that Claimant "appears to be suffering from malnutrition and self-neglect." (*Id*. at 360.)

Mr. Vecchio diagnosed Claimant with major depressive disorder, recurrent, moderate based on Claimant's reports of "a depressed mood most of the day, nearly every day, and markedly diminished interest in almost all activities, fatigue or loss of energy nearly every day, feelings of worthlessness and excessive or inappropriate guilt, [and] diminished ability to think, concentrate, or remember." (*Id*. at 359.) He also diagnosed Claimant with generalized anxiety disorder. (*Id*.) He gave her a poor prognosis. (*Id*.)

### 3. Treatment for Discoid Lupus, Psoriasis, and Arthritis

Claimant was diagnosed with chronic lupus erythematosus on March 20, 2008. (*Id*. at 260.) Her dermatologist, Dr. Michelle Endicott, D.O. ("Dr. Endicott"), treated her for chronic discoid lupus from approximately April 3, 2008, until November 19, 2009. (*Id*. at 271–90.) Claimant went several years without treatment and returned to Dr. Endicott on August 20, 2012. (*Id*. at 291.) She next presented to Dr. Endicott on October 22, 2013, due to a "new flare." (*Id*. at 677.) At that time, Dr. Endicott remarked that Claimant's discoid lupus was "much improved." (*Id*.) Claimant returned to Dr. Endicott for a follow-up appointment on March 19, 2014, and complained of increased itching and tiredness. (*Id*. at 676.) Dr. Endicott observed scarring and hypopigmented areas on Claimant's arms, chest, back, face, and scalp. (*Id*.) She noted that Claimant was "very noncompliant" with using her medication. (*Id*. (emphasis in original).)

Claimant complained of muscle aches and joint pain at her appointment with Ms. Wilson, her primary care provider, on November 9, 2015. (*Id.* at 425.) Ms. Wilson observed no rashes or lesions but noted "color changes" on Claimant's face. (*Id.* at 426.) Claimant was referred to a rheumatologist and a dermatologist. (*Id.*)

Claimant presented to rheumatologist Dr. Adenrele A. Olajide ("Dr. Olajide") for the first time on March 21, 2016. (*Id.* at 514, 651.) Dr. Olajide noted that Claimant had previously been diagnosed with discoid lupus and psoriasis but reported that her medication did not help. (*Id.*) He observed "patches of hypopigmentation" on Claimant's face and joint pain in her hands and knees. (*Id.* at 514–16, 651–53.) Dr. Olajide ordered "serologic testing . . . to determine the extent of her disease prior to initiating medication therapy." (*Id.* at 516, 653.) At her follow-up appointment with Dr. Olajide on July 11, 2016, Claimant complained of joint pain and fatigue. (*Id.* at 491, 628.) Dr. Olajide diagnosed her with arthritis and prescribed medication. (*Id.* at 494, 631.)

*4. Consultative Physical Examination: Dr. Timothy J. McCormick, D.O., M.P.H.*

Dr. Timothy J. McCormick, D.O., M.P.H. ("Dr. McCormick"), an occupational medicine specialist, performed a consultative physical examination of Claimant on February 26, 2015. (*Id.* at 324–31.) Claimant reported a history of discoid lupus, and Dr. McCormick observed "penny-sized lesions" on her chin, upper lip, and nose. (*Id.* at 324.) Claimant also reported stiffness and discomfort in her elbows, wrists, and ankles; blurry vision; and hair loss, all of which she attributed to her discoid lupus. (*Id.* at 324–25.)

Upon physical examination, Dr. McCormick observed that Claimant had corrected 20/30 vision. (*Id.* at 325.) He noted that she had "a thin body habitus" and that she "appears in fair general health." (*Id.*) Dr. McCormick also noted that Claimant's affect

was "sedated" because "[s]he spoke slowly, and her eyelids seemed to be droopy," but her "speech and hearing were normal." (*Id.* at 325–26.)

He observed that Claimant had a normal gait and did not require an assistive device and that she had normal range of motion and normal strength in her lower extremities. (*Id.*) When assessing Claimant's upper extremities, Dr. McCormick noted "generalized weakness" in "grasping bilaterally," pushing, and pulling, which he rated +4/5. (*Id.* at 326.)    He observed Claimant's range of motion in her shoulders to be somewhat limited and noted that "[s]he was slow and stiff with motion testing." (*Id.*) The remainder of Dr. McCormick's physical findings were unremarkable. (*Id.*)

### 5. *Evidence Related to Blepharitis*

On November 12, 2015, Claimant presented to an ophthalmologist and complained of worsening blurry vision in both eyes. (*Id.* at 364.) Claimant was diagnosed with tear film insufficiency of bilateral lacrimal glands and blepharitis in her lower eyelids. (*Id.* at 368.) She was "instructed to use artificial tears as needed" and was counseled about "[l]id scrubs and hygiene." (*Id.*) She was directed to follow up in one year for a complete eye exam. (*Id.* at 369.)

### 6. *Evidence Related to Irritable Bowel Syndrome*

On June 22, 2016, Claimant presented to her primary care provider, Ms. Wilson, and complained of "vomiting after meals" and "constant diarrhea." (*Id.* at 412.) Claimant reported "having multiple accidents daily" and stated that her condition had "gotten worse over the past month." (*Id.*) Ms. Wilson ordered testing and instructed Claimant to go to the emergency room if she continued experiencing diarrhea. (*Id.* at 414.) At her appointment with Ms. Wilson on September 7, 2016, Claimant reported that "her boewl

[sic] movements are improving." (*Id.* at 409.) The results of the testing that was performed were normal. (*See id.* at 448, 590.)

On October 14, 2016, Claimant presented to Dr. Larry Carter, D.O. ("Dr. Carter"), a gastroenterologist, complaining of "loose stools . . . with significant urgency" and abdominal pain. (*Id.*) Dr. Carter diagnosed Claimant with irritable bowel syndrome. (*Id.* at 450, 592.) He prescribed her medication and fiber supplements. (*Id.* at 451, 593.) At Claimant's appointment on February 13, 2017, Dr. Carter noted that her symptoms were "resolved." (*Id.* at 587.) He felt that additional testing was not "necessary at this time." (*Id.*)

### 7. *Evidence Related to Coronary Arteriosclerosis*

Claimant presented to her cardiologist on July 13, 2017, complaining of shortness of breath. (*Id.* at 705.) The cardiologist noted that Claimant had undergone a coronary artery bypass procedure on May 22, 2008. (*Id.*) Claimant reported that her coronary artery disease symptoms were improving and she experienced "no chest discomfort with daily activities" and did not use nitroglycerin. (*Id.*) She was diagnosed with coronary arteriosclerosis and was advised to begin medication, reduce her tobacco use, and follow up within a year. (*Id.* at 706.)

### C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the

listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the

claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five."  *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'"  *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635).  "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations."  *Id*. (quoting *Mascio*, 780 F.3d at 635).  If the claimant can perform other work, the ALJ will find her "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot perform other work, the ALJ will find her "disabled."  *Id*.

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 12.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) She found that Claimant's discoid lupus constituted a "severe" impairment. (*Id.*) However, she found that Claimant had no impairments, or a combination thereof, that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 14.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except she could frequently climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds." (*Id.*) In addition, the ALJ found that Claimant "could have no exposure to extreme cold or extreme heat" and "could not perform outdoor work." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 16.) She noted that Claimant is "closely approaching advanced age" with "at least a high school education." (*Id.* at 16–17.) She further noted that "[t]ransferability of job skills is not material to the determination of disability." (*Id.* at 17.) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a VE to aid in her finding that Claimant is capable of working as a warehouse support worker, produce weigher, or price marker. (*Id.* at 17.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from September 21, 2014, through the date of this decision." (*Id.* at 18.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by

substantial evidence and were reached through application of the correct legal standard."
*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434
F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion," and it
must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).
In other words, this Court "looks to [the] administrative record and asks whether it
contains 'sufficient evidence' to support the agency's factual determinations."  *Id.*
(alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*
"In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh
conflicting evidence, make credibility determinations, or substitute [its] judgment for that
of the [ALJ]."  *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th
Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled,"
this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.*
(quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ erred by concluding that her anxiety and depression
resulted in no more than minimal functional limitations and were thus not severe.  (ECF
No. 13 at 15, 17–18.)  She further asserts that the ALJ failed to consider evidence from her
treating physicians when determining that her blepharitis, irritable bowel syndrome,
psoriasis, arthritis, and coronary atherosclerosis were not severe.  (*Id.* at 16–17.)  And she
argues that the ALJ did not consider her discoid lupus symptoms in the RFC assessment.
(*Id.* at 18–19.)  The Commissioner responds that because the ALJ found Claimant's
discoid lupus to be a severe impairment and proceeded past the second step of the
sequential evaluation process, any error to list another impairment as severe was

harmless.  (ECF No. 16 at 12–13.)  He also argues that Claimant presented no evidence about the limitations caused by her alleged blepharitis, irritable bowel syndrome, psoriasis, arthritis, and coronary arteriosclerosis.  (*Id.* at 13–14.)  Finally, the Commissioner asserts that the ALJ properly evaluated Claimant's alleged mental impairments and did not err by relying on the opinions of the consultative examiner and state agency consultants instead of those of Claimant's treating providers.  (*Id.* at 14–17.)  Claimant replies that the ALJ's RFC assessment failed to account for the symptoms associated with her discoid lupus and for the limitations caused by her mental impairments.  (ECF No. 17.)[3]

### A.  Severity of Mental Impairments

Claimant first argues that the ALJ should have found her mental impairments severe.  (ECF No. 13 at 15, 17–18.)  To evaluate the severity of a claimant's mental impairments using the "special technique" prescribed by the regulations, the ALJ first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [his] findings."  *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1520a(b)(1)).  Next, the ALJ must "rate [the claimant's] functional limitation based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on

---

[3] The latter argument was raised for the first time in Claimant's reply brief.  (*Compare* ECF No. 13, *with* ECF No. 17.)  This Court generally does not consider issues that are raised in reply in the first instance.  *See Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("As a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived."); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 736, 745 n.4 (S.D.W. Va. 2014) ("[A]n argument raised for the first time in a reply brief or memorandum will not be considered.").  Even so, Claimant's argument plainly fails.  The most recent record evidence related to Claimant's mental impairments indicates that her anxiety and depression were "in full remission."  (Tr. at 692.)  A condition that "ha[s] resolved" generally does not "impose[] functional restrictions that should have been included in the RFC assessment."  *Hughes v. Astrue*, No. 1:09-cv-459, 2011 WL 4459097, at *11 (W.D.N.C. Sept. 26, 2011).  Claimant has offered no evidence that her mental impairments affect her ability to work despite being "in full remission."

a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). Specifically, the ALJ analyzes a claimant's functional limitations by assessing the claimant's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). If the claimant has no limitations or only mild limitations in these four areas, her "impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [her] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ relied principally on Mr. Vecchio's consultative psychological examination to determine that Claimant's mental impairments caused mild limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace and no limitations in adapting or managing herself. (Tr. at 13.) Claimant contends that Mr. Vecchio's consultative examination report identified more significant limitations than the ALJ found and that the ALJ should have considered her treatment records from Dr. Kottapalli and Dr. Cadle. (ECF No. 13 at 17.)

With respect to Mr. Vecchio's report, the ALJ engaged with each of the findings that Claimant identifies in her opening brief. (*Compare* Tr. at 13, *with* ECF No. 13 at 17.) For instance, Claimant states that Mr. Vecchio noted "poor insight[] and moderately deficient memory skills in the area of recent memory with mild deficits in the areas of remote memory, concentration, persistence and pace." (ECF No. 13 at 17.) In determining that Claimant had mild limitations in understanding, remembering, or applying information, the ALJ pointed to Mr. Vecchio's observations that Claimant "exhibited [a] concrete but consistent stream of thought" and her "thought content was

focused on her mental status, fatigue, and life station." (Tr. at 13.) The ALJ also stated, "Although her insight was poor, [Claimant's] judgment was within normal limits." (*Id.*) And she noted that Claimant "exhibited moderately deficient recent memory, mildly deficient remote memory, and normal immediate memory." (*Id.*) The ALJ essentially adopted Mr. Vecchio's findings that Claimant "exhibited mildly deficient concentration, persistence, and pace." (*Id.*) Further, in concluding that Claimant had mild limitations in interacting with others, the ALJ credited Claimant's statements to Mr. Vecchio that she had "a persistently depressed mood, which is consistent with an observation of tearfulness," but Mr. Vecchio noted that Claimant "was cooperative and exhibited normal to mildly impaired social interactions during her evaluation." (*Id.*) Finally, in finding that Claimant had no limitations in adapting or managing herself, the ALJ noted that Claimant "reported feeling paranoid while driving" but nonetheless told Mr. Vecchio that she "watches television, performs household chores (such as picking up and doing laundry), sits on her porch, and prepares microwave foods." (*Id.*) With the exception of Mr. Vecchio's statement that Claimant's prognosis was poor, the ALJ discussed every item from Mr. Vecchio's report to which Claimant refers in her opening brief. (ECF No. 13 at 17.) It is unclear what else the ALJ could have mentioned.

The ALJ further relied on the opinions from the state-agency psychological consultants, which she found to be consistent with Mr. Vecchio's findings. (Tr. at 14.) Even with the benefit of the evidence from Dr. Kottapalli—all of her treatment notes in the record, not just the single note dated after the alleged onset of Claimant's disability— the state-agency consultant at the disability-determination level concluded that Claimant had only mild difficulties in maintaining concentration, persistence, or pace, and no other limitations. (*Id.* at 58–59.) The state-agency psychological consultant at the

reconsideration level likewise found that Claimant's mental impairments were not severe, despite observing more limitations than the consultant at the disability-determination level.  (*Id*. at 70.)  Notably, Claimant does not challenge the weight the ALJ assigned to the opinions of these consultants.  (*See* ECF No. 13 at 15–19.)  Their opinions and Mr. Vecchio's findings constitute substantial evidence to support the ALJ's decision.  *See Pierce v. Colvin*, No. 5:14-cv-37, 2015 WL 1366651, at *19 (N.D.W. Va. Jan. 9, 2015) (report and recommendation of magistrate judge) (upholding ALJ's finding that mental impairments not severe based on findings of consultative examiner and state-agency consultants).

Dr. Cadle's treatment notes do not indicate otherwise.  As an initial matter, the mere presence of "evidence to support a finding to the contrary" does not inherently indicate that the ALJ's decision is not supported by substantial evidence.  *Cook v. Colvin*, No. 2:15-cv-07181, 2016 WL 5661348, at *7 (S.D.W. Va. Sept. 29, 2016).  "The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."  *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (citing *Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993)).  But more importantly, although Dr. Cadle noted on August, 19, 2016, that "on her assessments, [Claimant] continues to report clinically significant levels of depression and anxiety," four months later, on January 27, 2017, Dr. Cadle observed that Claimant's anxiety and depression were "in full remission" and instructed Claimant to return to treatment "only as needed."  (Tr. at 546, 692.)  Indeed, the ALJ reasoned that Claimant's mental impairments did not affect her ability to work because her condition was stable and she was "responsive to treatment."  (*See id*. at 13.)  That indicates that her mental impairments were not severe.  *Lemay v. Colvin*, No. WGC-15-cv-1615, 2016 WL 3027528, at *5 (D. Md. May 27, 2016) (upholding ALJ's conclusion that mental impairments not

severe where "[m]ental health treatment notes indicate that the claimant's condition is stable on medication and that his symptoms significantly improved"); *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

In sum, the undersigned **FINDS** that the ALJ did not err by determining that Claimant's mental impairments were not severe.

*B. Severity of Physical Impairments*

Claimant also argues that the ALJ disregarded evidence from her treating physicians in finding that her blepharitis, irritable bowel syndrome, psoriasis, arthritis, and coronary arteriosclerosis were not severe. (ECF No. 13 at 16–17.) The ALJ explained that "these conditions were stable and resulted in no more than minimal effect on [Claimant's] ability to work" and "were either responsive to treatment, caused no more than minimal vocational relevant limitations, and/or" did not satisfy the durational requirement. (Tr. at 13.)

With respect to each of these alleged impairments, there is little record evidence aside from a diagnosis and, in some cases, prescribed treatment. For instance, as the ALJ noted, Claimant's "irritable bowel syndrome resolved with fiber intake as well as prescribed medication." (*Id.*; *see id.* at 587.) Claimant was "instructed to use artificial tears as needed" to treat her blepharitis and directed to follow up in one year for a complete eye exam, but there is no documentation that a follow-up occurred. (*Id.* at 368–69.) She was diagnosed with coronary arteriosclerosis and prescribed medication on July 13, 2017, but reported to her cardiologist that she experienced "no chest discomfort with daily activities." (*Id.* at 705–06.) And she was diagnosed with arthritis on July 11, 2016, and prescribed medication, but there is no evidence indicating further treatment. (Tr. at

494, 631.)  Testing results dated August 20, 2008, were suggestive of psoriasis, but the record does not reflect that Claimant was treated for psoriasis symptoms separately from her treatment for discoid lupus after her alleged onset date.  (*Id*. at 275.)

"The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work." *Blevins v. Colvin*, No. 2:14-cv-01572, 2015 WL 930195, at *9 (S.D.W. Va. Mar. 3, 2015) (proposed findings and recommendation of magistrate judge).  Simply put, Claimant has not met that burden with respect to these impairments.  *See id*. at *10 ("Certainly, if carpal tunnel syndrome was a severe impairment, Claimant would have supplied evidence establishing the diagnosis, verifying the twelve-month duration requirement, and demonstrating the specific effects of the syndrome on his ability to perform basic work activities.").  The ALJ aptly reasoned that the impairments "were either responsive to treatment, caused no more than minimal vocational relevant limitations, and/or" did not satisfy the durational requirement.  (Tr. at 13.)  "[A] diagnosis is insufficient to prove disability—rather, there must be resultant functional limitations precluding a claimant's ability to work." *Smith v. Berryhill*, No. 3:16-cv-11868, 2018 WL 3800039, at *9 (S.D.W. Va. July 17, 2018) (citing *Gross*, 785 F.2d at 1166), *adopted by* 2018 WL 3795277 (S.D.W. Va. Aug. 9, 2018). Claimant has demonstrated no such limitations caused by her blepharitis, irritable bowel syndrome, psoriasis, arthritis, and coronary arteriosclerosis.  Accordingly, the undersigned **FINDS** that the ALJ properly deemed them not severe.

### C.  Consideration of Discoid Lupus Symptoms in RFC Assessment

Finally, Claimant argues that the ALJ's RFC assessment failed to account for "the evidence of arthritis, abnormally low weight and chronic skin symptoms caused by lupus."

(ECF No. 13 at 18–19; *see* ECF No. 17 at 2.)  When conducting the RFC assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (internal quotation marks omitted).  Those functions include an assessment of the claimant's physical abilities, mental abilities, and other work-related abilities that may be affected by the claimant's impairments.  *Id.* at 636 n.5 (citing 20 C.F.R. § 416.945); *see* 20 C.F.R. § 404.1545.  In addition, the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio*, 780 F.3d at 636.

Contrary to Claimant's argument, in conducting the RFC assessment, the ALJ acknowledged that Claimant reported itching, joint pain, and fatigue associated with her discoid lupus.  (Tr. at 15.)  But the ALJ explained that "evidence of no more than mild physical exam objective abnormalities, despite minimal lupus treatment, is inconsistent with the degree of limitations alleged by [Claimant]."  (*Id.* at 15–16.)  She elaborated that Claimant received "no ongoing treatment for lupus" during the relevant period and was "very noncompliant" with the treatment she received in 2013 and 2014.  (*Id.* at 16.)  Despite that, the ALJ noted, Claimant's "objective physical exam findings remained largely normal."  (*Id.*)  This, the ALJ reasoned, was "inconsistent with the debilitating symptoms alleged."  (*Id.*)  She also described the results of testing by consultative medical examiner Dr. McCormick, which indicated that Claimant "exhibited normal dexterity with no calluses or atrophy of her hands," had only "mildly decreased" grip strength, had a "full range of motion other than limited shoulder elevation and abduction" in her upper

extremities, had "mildly diminished" strength in her upper extremities, and had a full range of motion in her spine and lower extremities. (*Id.* at 15.) The ALJ summarized, "Overall, [Claimant's] allegations of debilitating pain and other symptoms are inconsistent with medical imaging, diagnostic testing, treatment notes demonstrating successful conservative care, and physical examination findings that are generally normal to mildly abnormal." (*Id.* at 16.) Notably, Claimant does not challenge the ALJ's evaluation of her subjective complaints about her symptoms. (*See* ECF Nos. 13, 17.) Nor does she take issue with the "great weight" the ALJ accorded to the opinion of the state-agency medical consultant. (*See id.*; Tr. at 16.)

When conducting the RFC assessment, "[t]he ALJ must identify the evidence relied upon and 'build an accurate and logical bridge from the evidence to [the] conclusion.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). She did so in this case. As such, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 13), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the

date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: February 7, 2020

Dwane L. Tinsley
United States Magistrate Judge